(No. 2532.   Nov. 30, 1921.)

## STATE V. DIAMOND

### SYLLABUS BY THE COURT

(1) Chapter 140, Laws 1919, interpreted, and **held,** that the offenses therein enumerated are not confined to acts of violence or force or other unlawful things, but include all acts, peaceful or otherwise, which have for their object the destruction of organized government, or acts antagonistic to or in opposition to such organized government or acts inciting or attempting to incite revolution against or opposition to such organized government, or the teaching of such doctrines.                                                          P. 479

(2) The act is **held** to be unconstitutional as violative of the right of free speech guaranteed by section 17 of article 2 of the state. Constitution.                                                          P. 479

(3) The word "revolution," as used in the act,**held** to include all forms of revolution, accomplished by peaceful means or otherwise, and not to be limited to revolution by force of arms.                                                          P. 482

(4) The act uses words of no determinative meaning, and the language is so general and indefinite as to embrace not only acts properly and legally punishable, but also others which cannot be punished, and it is for this reason void for uncertainty.                                                          P. 485

(5) Where an act creating a crime is found to be unconstitutional, the question may be raised for the first time on appeal.                                                          P. 488

(6) To "incite" to revolution is to arouse to action. P. 484

Appeal from District Court, Colfax County; Leib, Judge.

Jack Diamond was convicted of attempting to incite revolution and opposition to the organized government of the United States of America and of the State of New Mexico, and he appeals. Reversed and remanded, with directions to dismiss cause and discharge defendant.

Edward D. Tittman, of El Paso, Tex., for appellant.

H. S. Bowman, Atty. Gen., and A. M. Edwards, Asst. Atty. Gen., for the State.

### OPINION OF THE COURT.

PARKER, J.   The appellant, Jack Diamond, was convicted in the district court of Colfax county and sentenced to the penitentiary, from which judgment this appeal is prosecuted.

The indictment charged that—

The defendant "did then and there unlawfully and feloniously attempt to incite revolution and opposition to the organized government of the United States of America and of the state of New Mexico by then and there soliciting members for the Industrial Workers of the World, an organization which has for its purpose and aim the destruction of organized government, federal, state and municipal."

The statute under which the prosecution was had is chapter 140, Laws 1919, which provides as follows:

"Section 1.   That it shall be unlawful for any person or persons, firm or corporation, to commit or perform or to cause to permit or to be performed any act of any kind whatsoever which has for its purpose or aim the destruction of organized government, federal, state or municipal, or to do or cause to be done any act which is antagonistic to or in opposition to such organized government, or incite or attempt to incite revolution or opposition to such organized government.

"Any person violating any of the provisions of this act shall be deemed guilty of a felony and upon conviction thereof shall be punished by a fine of not less than two hundred dollars nor more than one thousand dollars or by imprisonment in the state penitentiary for not less than one year, nor more than ten years, or by both, such fine and imprisonment in the discretion of the court.

"Sec. 2.   It shall be unlawful for any person or persons, firm or corporation, to advocate or teach, or cause to be advocated, or taught, in any manner whatsoever, the doing or performance of any of the acts prohibited by section 1 hereof."

Counsel for appellant argues that the act is unconstitutional for several reasons, among which is is that it violates section 17 of article 2, of the state Constitution, which provides:

"Every person may freely speak, write or publish his sentiments on all subjects, being responsible for the abuse of

that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

[1] It is apparent from the terms of the statute, considered as a whole, that the offenses enumerated are not confined to acts of violence or force or other unlawful things, but include all acts, peaceful or otherwise, which have for their object the destruction of organized government, or acts antagonistic to or in opposition to such organized government, or acts inciting or attempting to incite revolution against or opposition to such organized government, or the teaching of such doctrines. In this particular the statute is unique. Under its terms no distinction is made between the man who advocates a change in the form of our government by constitutional means, or advocates the abandonment of organized government by peaceful methods, and the man who advocates the overthrow of our government by armed revolution, or other form of force and violence. Both are alike guilty. It prohibits alike the creation of public opinion by argument and persuasion, and the compulsion of action by the people by force of arms, intimidation, sabotage, or other criminal or illegal means. And we are not at liberty to supply by intendment the element of force and violence which would render the statute free from the objection raised to it. To do so would be to insert words in the statute which are not there and which would entirely change its meaning. This is not allowable, especially in statutes creating crimes, where the rule of strict construction must be applied. State v. Armijo, 19 N. M. 345-349, 142 Pac. 1126.

[2] In State v. Tachin, 92 N. J. Law, 270, 106 Atl. 145, the New Jersey court had before it a somewhat similar question to the one at bar. The statute of New Jersey (P. L. 1918, p. 130) provided in section 1 of the act punishment for inciting, or, by writing, speech, or other means, attempting to incite,

---

---

"insurrection or sedition." Section 2 of the act provided that—

"Any person who shall advocate, in public or private, by speech, writing, printing, or by any other means, the subversion or destruction by force of the government of the United States, or of the state of New Jersey, or attempt by speech, writing, printing, or in any other way whatsoever to incite or abet, promote or encourage hostility or opposition to the government of the United States, or of the state of New Jersey, shall be guilty," etc.

Section 3 of the act prohibited membership in any society formed for the purpose of inciting, abetting, promoting, or encouraging hostility or opposition to the government of the United States, or of the state of New Jersey.

In the case before the court the defendant was charged with a violation of section 2 of the act by reason of a speech in which it was urged he attempted to incite hostility and opposition to the government of the United States. The section was challenged as unconstitutional upon the ground that it invaded the constitutional guaranty of the right of free speech. The majority of the court construed the section to the effect that the words "hostility or opposition to the government of the United States, or of the State of New Jersey," meant such hostility and opposition as involved the "subversion or destruction by force" of those governments, and held that the statute, as thus construed, was constitutional. The court states, however, that if the statute punished hostility or opposition to the government without force, the statute would be unconstitutional. Two vigorous dissents were filed in this case, which are reported in 93 N. J Law., 485, 108 Atl. 318. In one of these opinions sections 2 and 3 of the act are condemned on the ground that they violate the right of free speech, the freedom of the press, and the freedom of assembly guaranteed by the federal Constitution and the Constitution of New Jersey. Sections 2 and 3 of this same

act came before the New Jersey court again in State
v. Gabriel, 112 Atl. 611. The court adhered to the
former construction of section 2 of the act, but held
section 3 to be unconstitutional, and said:

"At the close of the trial counsel for defendant moved that
the court direct that the defendant be acquitted on this in-
dictment, because the statute upon which it rested is uncon-
stitutional, and this we think is sound. Under the Consti-
tution and Bill of Rights the Legislature cannot make it
criminal to belong to a party organized or formed for the
purpose of encouraging hostility or opposition to the gov-
ernment of the United States or of this state, unless the
hostility or opposition includes a purpose to overthrow or
subvert such government. The constitutionality of the sec-
ond section of the act was sustained in State v. Tachin, 92
N. J. Law, 269, 106 Atl. 145, because that section provides
that the hostility or opposition prohibited involved subver-
sion and destruction by force. While by the section under
consideration it is made a crime to be a member of a socie-
ty organized or formed for the purpose of encouraging hos-
tility or opposition to the federal or state government, not
to subvert or destroy them by force, and would apply to any
citizen who sought a change in the form of government by a
most peaceful means * * * In our judgment so long as an
organization formed for the purpose reserved in the para-
graph of the constitution referred to confines its purpose to
peaceful hostility or opposition and does not advocate or in-
dicate a purpose to overthrow or subvert the existing gov-
ernment by force, but only by constitutional methods, the
right of the members of such society to assemble together
and consult for the common good is protected by the bill
of rights."

In Iowa they have an act very similar to the New
Jersey act, and which is chapter 372, Laws 1917.
Section 1 prohibits the inciting of "insurrec-
tion or sedition." Section 2 of the act pro-
hibits the advocacy by speech, writing, print-
ing, or other means of the subversion and
destruction by force of the government of the
state of Iowa or of the United States, or the attempt
by speech, writing, printing, or other means to in-
cite or abet, promote or encourage hostility or oppo-
sition to the government of the state of Iowa or of
the United States. Section 3 of the act prohibits
membership in any organization or society organ-

ized for the purpose of inciting, abetting, promoting, or encouraging hostility or opposition to the government of the state of Iowa or of the United States. This statute came before the Supreme Court of Iowa in State v. Gibson, 174 N. W. 34. The defendant was charged that—

He "did attempt by speech, action, and manner of speaking to incite, abet, promote, and encourage hostility and opposition to the government of the state of Iowa and of the United States, contrary to the statutes in such case made and provided," etc.

The indictment evidently was brought under section 2 of the act and was sustained by the court upon the ground that it charged an attempt to promote sedition. If the construction of the statute by the court was intended to mean that the hostility and opposition to the government was hostility and opposition by force, the opinion of the court is no doubt correct. The court said:

"It is presented that the statute violates the guaranty of article 1 § 7, of the Constitution of the state that all may speak, write, and publish their sentiments on all subjects, being responsible for the abuse of that right, and that no law shall be passed to restrain or abridge the liberty of speech or of the press. The constitutional guaranty itself qualifies the immunity by a plain indication that, while the right is given, the abuse of that right is not to be tolerated. The framers of our Constitution were laboring for the good of the commonwealth. They did not intend to protect what might destroy the state. It was not intended that the right of free speech included the right to promote sedition.".

If our interpretation of our statute is correct, as no doubt it is, the whole statute is unconstitutional upon the same reasoning as that adopted by the New Jersey court in regard to section 3 of their act. It is true that section 3 of that act violated the right of assembly, but the principles governing the right of assembly and the right of free speech are the same.

[3] What has been heretofore said refers to the statute generally. It remains to consider specifical-

ly the provisions prohibiting the inciting or attempting to incite revolution. Is the word "revolution" as used in the statute confined to an armed revolution, or does it include revolution by peaceful methods? "Revolution" has been variously defined as a radical change or modification of the government, McMullen v. Hodge, 5 Tex. 34-75; the overthrow of an established political system, Ballentine's Law Dictionary; a fundamental change in government or in the political Constitution of a country effected suddenly and violently, and mainly brought about by internal conditions, New Standard Ency.; a radical change in social or governmental conditions; the overthrow of an established political system, generally accompanied by far reaching social changes, Century Dictionary.

In the American mind the word "revolution," at first view, is associated with the war for independence by the colonies, which was, of course, a rebellion and a revolution accomplished by force of arms. But this cannot be said to be the ordinary meaning of the word in all cases. The promulgation and adoption of the Constitution of the United States was a revolution of far-reaching importance. At the time there was in existence a complete government of the 13 states under the Articles of Confederation. Under article 13 of that document the Articles of Confederation could be amended only with the consent of all the states, and they provided for a "perpetual union." Notwithstanding this contract between the 13 states, the Constitution provided that upon the ratification of the same by 9 states it should become established as a Constitution between the states so ratifying the same. As a matter of fact, 11 of the states ratified before any action was taken under the Constitution, leaving North Carolina and Rhode Island without any participation in the new government. The contract between the states was thus violated by the adoption of the Con-

stitution, and the Constitution went into effect without the consent of those two states. Upon this subject Judge Cooley says:

"This exclusion was not warranted by anything contained in the Articles of Confederation, which purported to be articles of 'perpetual union;' and the action of the eleven states in making radical revision of the Constitution and excluding their associates for refusal to assent, was really revolutionary in character, and only to be defended on the same ground of necessity on which all revolutionary action is justified, and which in this case was the absolute need, fully demonstrated by experience, of a more efficient general government." See Cooley's Constitutional Limitations (7th Ed.) pp. 9 and 10.

[6] The result was accomplished by argument and persuasion, and, of course, no one would say that any law could now be passed which would make criminal the same kind of conduct. Nor is the meaning of the word changed by its connection with the word "incite." To "incite" is to arouse to action, nothing more, and cannot be held to narrow the word "revolution" to revolution by violence. The doctrine of noscitur a sociis is applicable here. The word " revolution" is directly associated with the words "opposition to such organized governments" and must be held to include the same thing. A fair, general view of the whole statute leads to the conclusion that it was designed to close the mouths and tie the hands of people who were dissatisfied with the government as at present constituted, and who advocated by any means, peaceful or otherwise change in the form of government, or the abandonment of organized government entirely. This act was passed after the Armistice and before the conclusion of peace with Germany, which has been accomplished only within the last few days. But the act is not a war measure, and none of the considerations which apply to conduct which constitutes a proximate and imminent danger to the government in the time of war, or danger to the success of its arms against the public enemy, apply here. See Schenck v. U. S.,

State v. Diamond, 27 N. M. 477

249 U. S.  47, 39 Sup. Ct. 247, 63 L. Ed. 470, and Gilbert v. Minnesota, 254 U. S. 325, 41 Sup. Ct. 125, 65 L. Ed. ——, where the distinction is pointed out that time and circumstances may be determinative as to whether a statute limiting the right of free speech will be valid.

[4] A further technical legal objection to the statute is its want of certainty.  Where the statute uses words of no determinative meaning, or the language is so general and indefinite as to embrace not only acts commonly recognized as reprehensible, but also others which it is unreasonable to presume were intended to be made criminal, it will be declared void for uncertainty. 16 C. J. § 28.  Thus in U. S. v. Reese, 92 U. S. 214, 23 L. Ed. 563, the defendant, with another, had been indicted for an offense under an act of Congress, and was charged with refusing to receive and count at an election the vote of a citizen of African descent.  Congress had passed an act (16 Stat. 140) to put the Fifteenth Amendment into operation, section 4 of which provided for the punishment of any person who should by force, bribery, threat, intimidation, or other unlawful means, hinder, delay, or combine with others to hinder, delay, prevent, or obstruct any citizen from doing any act required to be done to qualify him to vote or from voting at any election.  It will thus be seen that this section went beyond the purview of the Fifteenth Amendment and was not limited in its terms to cases involving the deprivation of the right to vote by colored people,  but included all classes of voters. The court pointed out that the statute did not confine its operation to unlawful discrimination on account of race, etc., and that the act was broad enough to punish discrimination against any class of voters, which was, of course, beyond the power of Congress.  The court said:

"It remains now to consider whether a statute, so general as this in its provisions, can be made available for the pun-

ishment of those who may be guilty of unlawful discrimination against citizens of the United States, while exercising the elective franchise, on account of their race, etc.

"There is no attempt in the sections now under consideration to provide specifically for such an offense. If the case is provided for at all, it is because it comes under the general prohibition against any wrongful act or unlawful obstruction in this particular. We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited power, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question, then, to be determined, is whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed it is general only.   *   *   *

"To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."

In Augustine v. State, 41 Tex. Cr. R. 59, 52 S. W. 77, 96 Am. St. Rep. 765, the question was as to the uncertainty of a statute which provided for a different venue in cases of murder by "mob violence." The court said:

"We have given this question much thought and study, and we confess to be unable to solve the difficulty, and to determine what the Legislature really meant by the term 'mob violence,' or what character of cases they intended the act should embrace. It is so uncertain in its terms as to escape intelligible construction, and we therefore declare it inoperative and void."

In U. S. v. Capital Traction Co., 34 App. D. C. 592, 19 Ann. Cas. 68, the question was whether an act of Congress which made it a criminal offense for the street railway company in the District of Columbia to run an insufficient number of cars to accom-

State v. Diamond, 27 N. M. 477

modate persons desiring passage thereon without crowding the same was so indefinite and uncertain as to be void. The court said:

"What shall be the guide to the court 'or jury in ascertaining what constitutes a crowded car? What may be regarded as a crowded car by one jury may not be so considered by another. What shall constitute a sufficient number of cars in the opinion of one judge may be regarded as insufficient by another. What may be regarded as grounds for acquittal by one court may be held sufficient to sustain a conviction in another. The principle of uniformity, one of the fundamental elements essential in determining the validity of criminal statutes, is wholly lacking. There is a total absence of any definition of what shall constitute a crowded car. This important element cannot be left to conjecture, or be supplied by either the court or the jury. It is of the very essence of the law itself, and without it the statute is too indefinite and uncertain to support an information or indictment."

In Czarra v. Board of Medical Supervisors, 25 App. D. C. 443, the question was whether an act of Congress providing for the cancellation of a physician's license to practice was void for uncertainty. The act (29 Stat. 200) provided that the license might be revoked for any of the following causes, to wit:

"The employment of fraud or deception in passing the examinations provided for in this act, chronic inebriety, the practice of criminal abortion, conviction of crime involving moral turpitude, or of unprofessional or dishonorable conduct."

The court said:

"Reasonable certainty, in view of the conditions, is all that is required, and liberal effect is always to be given to the legislative intent when possible. But when the Legislature declares an offense in words of no determinate significance, or its language is so general and indefinite as that it may embrace within its comprehension, not only acts commonly recognized as reprehensible, but others also which it is unreasonable to presume were intended to be made criminal, the courts, possessing no arbitrary discretion to discriminate between those which were and those which were not intended to be made unlawful, can do nothing else than declare the statute void for its uncertainty."

The court then quotes from U. S. v. Reese, supra, as follows:

"It would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government."

See, also, in this connection, Stoutenburgh v .Frazier, 16 App. D. C. 229; State v. Gaster, 45 La. Ann. 636, 12 South. 739; Ex parte Jackson, 45 Ark. 158.

In view of the foregoing considerations and the cases cited, it would seem clear that the statute under consideration here is void for uncertainty.

[5] The unconstitutionality of the act was not raised in the trial court, and the Attorney General insists that the weight of authority supports his contention that a constitutional question is not jurisdictional in character, and therefore cannot be raised for the first time on appeal.

It is true that we have held in State v. Chavez, 19 N. M. 325, 142 Pac. 922, Ann. Cas. 1917E, 127, and State v. Garcia, 19 N. M. 420, 421, 143 Pac. 1012, that where the alleged unconstitutional character of a statute concerns a matter of evidence, rather than the offense itself, the constitutional question cannot be raised for the first time on appeal. But in this case a different proposition is involved. Here the question of the constitutionality of the act involved determines whether a crime has been committed. If the law is void, no crime has been committed and none can be committed under it, and the court has no jurisdiction over the person of the defendant or the subject-matter of the cause. It is a proceeding to punish a man where there is no law authorizing the same. In such a case it would seem that the question is jurisdictional and may be raised for the first time on appeal and we so hold.

See, in this connection, Schwartz v. People, 47 Colo. 483, 104 Pac. 92; State v. Gibson (Iowa) 174 N. W. 34; and State v. Winehill & Rosenthal, 147 La. 781, 86 South, 181.

For the reasons stated, the judgment of the court below will be reversed, and the cause remanded, with directions to the district court to dismiss the cause and discharge the defendant, and it is so ordered.

RAYNOLDS, C. J., concurs.

DAVIS, J., did not participate.