413 P.2d 757

**STATE of Arizona, Plaintiff,**

**v.**

**Robert E. MILLER, Defendant.**

**No. 1693.**

Supreme Court of Arizona.

In Banc.

April 29, 1966.

Robert K. Corbin, Maricopa County Atty., Joe R. Glenn, Deputy County Atty., John A. Golden, Former Deputy County Atty., for plaintiff.

Lewis, Roca, Scoville, Beauchamp & Linton, John J. Flynn, Phoenix, Robert A. Jensen, Phoenix, for defendant.

McFARLAND, Justice.

The following questions were certified by the Superior Court of Maricopa County and filed on the 15th day of April 1966, in accordance with Rule 346 of Rules of Criminal Procedure, 17 A.R.S., in the case of State of Arizona v. Robert E. Miller, defendant, in Cause No. 48731:

1. Does Article 6, Section 2 of the Arizona Constitution prohibit or divest the Superior Court of jurisdiction to declare a statute unconstitutional?

2. Is A.R.S. Sec. 38–609 so vague, indefinite and uncertain that its application denies due process of law under the state and federal constitutions?

3. Is the indictment as pled fatally defective as a matter of law in that it fails to advise the defendant of the nature and cause of the accusation against him as required by Article 2, Sections 4 and 24, of the Arizona Constitution and the Sixth and Fourteenth Amendments to the United States Constitution?

In the presentation of the case in oral argument on April 21, 1966, it was stated that the case was set down for trial for May 2, 1966, and that an early decision was imperative.

The first question presented is in regard to the meaning of the constitutional amendment, Article VI, Section 2, adopted in 1960, A.R.S., which provides:

"The Supreme Court shall sit in accordance with rules adopted by it, either in banc or in divisions of not less than three justices, but the court shall not declare any law unconstitutional except when sitting in banc. The decisions of the court shall be in writing and the grounds stated."

Before the adoption of this amendment, the Arizona Supreme Court could sit only in banc. The amendment permits the court to sit in divisions or in banc, but provides that "the court shall not declare any law unconstitutional except when sitting in banc." The intention was not to change the law in regard to passing upon constitutional questions, but simply to require this court to continue to sit in banc for such decisions. It does not deprive the superior court of jurisdiction initially to hear and determine constitutional questions.

The second question presented is whether A.R.S. § 38–609 is so vague, indefinite and uncertain that its application denies due process of law under the state and federal constitutions. That section reads as follows:

"§ 38–609. Retention of salary of subordinate; penalty

"A public officer who accepts, retains or diverts for his own use or the use of any other person any part of the salary or fees allowed by law to his deputy, clerk or other subordinate officer, is guilty of a felony."

A law may not be so uncertain that it will admit of different constructions. State v. Locks, 97 Ariz. 148, 397 P.2d 949. In the case of State v. Menderson, 57 Ariz. 103, 111 P.2d 622, we said:

"What a statute commands or prohibits in the creation of new crimes should be very definite and easily understood by the common man. The rules in that respect, as announced by different courts, are collated in H. Earl Clack Co. v. Public Service Commission, 94 Mont. 488, 22 P.2d 1056, 1059, and we quote therefrom at length, as follows:

"'* * * "'Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts * * * to avoid.' United States v. Brewer, 139 U.S. 278, 11 S.Ct. 538, 35 L. Ed. 190. 'In order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty.' Tozer v. United States (C.C.) 52 F. 917. 'If the Legislature undertakes to define by statute a new offense, and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime.' United States v. Reese, 92 U.S. 214, 23 L.Ed. 563." Burk v. Montana Power Co., 79 Mont. 52, 255 P. 337, 339.

"'"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 127, 70 L.Ed. 322.

"'"The dividing line between what is lawful and unlawful cannot be left to con-

jecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another." United States v. Capital Traction Co., 34 App.D.C. 592, 19 Ann.Cas. 68.'" 57 Ariz. at 108, 111 P.2d at 624.

The question then is whether § 38–609 meets the test as to definiteness as stated in State v. Menderson, supra, which followed the law enunciated by the United States Supreme Court. In passing upon this question it is necessary that we examine the legislative history of the statute.

It was first adopted in our Penal Code in 1913 in Section 77, under Title V, "Of Crimes By and Against the Executive Power of the State," in the following words:

"77. Every officer of this state, or of any county, city or town therein, who ac-

cepts, keeps, retains, or diverts for his own use or the use of any other person any part of the salary or fees allowed by law to his deputy, clerk, or other subordinate officer, is guilty of a felony."

In the codification of the 1928 Code the words "[e]very officer of this state, or of any county, city or town therein" were deleted, and "[e]very public officer" were substituted therefor; also the word "keeps" was delineated. In the codification of 1956 the words "[e]very public officer" were changed to "[a] public officer." Our Penal Code in 1913 was adopted largely from the Penal Code of California. Hoy v. State, 53 Ariz. 440, 90 P.2d 623. Section 77 of the 1913 Penal Code was taken from the California Code.

The provision first appeared in the Code of California in 1872, under "An Act to protect the wages of labor and the salaries and fees of subordinate officers." Stat. 1872, Ch. 637, § 2, read:

"Sec. 2. Every officer of the State or any county, city, or township therein, who keeps or retains any part or portion of the salary or fees allowed by law to his deputy, clerk, or subordinate officer, is guilty of a felony."

The California Code, which was recodified in 1901, contained this section.[1] It was

---

[1] The codification which included this section was held unconstitutional in Lewis

v. Dunne, 134 Cal. 291, 66 P. 478, 55 L.R.A. 833, because it did not fulfill pro-

re-enacted in 1905, at which time it was amended to read:

"74a. Every officer of this state, or of any county, city and county, city, or township therein, who accepts, keeps, retains or diverts for his own use or the use of any other person any part of the salary or fees allowed by law to his deputy, clerk, or other subordinate officer, is guilty of a felony."

It has been retained in this language since that date with the exception that the words "township therein" have been changed to "judicial district." Cal.Gov.C.A. § 1195.

Counsel have not pointed to any prosecutions or to any decisions in regard to prosecutions for violations either in California or in Arizona under these sections.

In the early days in California, there developed two methods of compensation of employees in the different counties of the state. In most counties, a lump sum was allowed to the principal, out of which he was required to pay his deputies. Then, in a smaller number, the principal was allowed a fixed salary and certain deputies allowed fixed salaries. Tulare County v. May, 118 Cal. 303, 50 P. 427. This indicates the reason for the changes in the wording of the statute in 1905 and the addition of the word "accept."

In the case of Bayley v. Garrison, 190 Cal. 690, 214 P. 871, where Section 74a of the California Code was discussed as it affected the right to increase the salaries of deputies during their term of office, under the constitutional provision prohibiting the changing of the salary of a public official during his term of office, the court stated:

"* * * In considering this question it should be observed at the outset that the Penal Code (section 74a) makes it a felony for the officer to directly or indirectly receive or accept any part of the compensation of his deputy. That section provides as follows:

" 'Every officer of this state, or of any county, city and county, city, or township therein, who accepts, keeps, retains, or diverts for his own use or the use of any other person any part of the salary or fees allowed by law to his deputy, clerk, or other subordinate officer, is guilty of a felony.'

"It is clear then that whatever advantage the officer may derive from the fact that his deputy has an increased salary is not a direct benefit, but arises, if at all, from the securing of more valuable or competent help than could be obtained for the lesser amount. Is this advantage an increase of his compensa-

cedural requirements, as contained in the constitution. Constitution Article IV, § 24. See Deering on the history of the

act contained in footnote 2 under § 5, p. 4 Penal Code of California 1931.

tion within the meaning of the Constitution? So far as we know this point has never been decided adversely to the constitutionality of an increase of compensation to the deputy because of whatever incidental advantage might result to the principal. The point does not seem to have been considered sufficiently important to have been even suggested in any of the cases. *Perhaps the outstanding reason for this is that it is by no means clear that the additional compensation to the deputy is an advantage to the principal, and because the fixing of a salary to the deputy is altogether taken out of the hands of the principal, and there is no means of ascertaining whether he could do better or worse for himself financially by the selection and payment of the deputy out of his own salary. * * *"* [Emphasis added.] 190 Cal. at 692, 214 P. at 872.

This case indicates that the court looked upon this provision of the law as preventing change of salaries of deputies by the principal.

In considering the history in the development of this law in California, we are led to the conclusion that it was first enacted to prevent the office-holder, when the fee system was in effect, from retaining part of the fees or the salary of the deputy, thus increasing his own, or to change the salary of a deputy requiring one deputy to take less and give it to another person.

This is clear from the placing in the statute of the wording "who accepts, keeps, retains or diverts *for his own use or the use of any other person.*" In the construction of both the California and the Arizona acts, the emphasis must be placed upon the words "his own use, or the use of any other person."

It is apparent that the changes which were made in the system of payment in the different counties in California for officials from a lump sum to definite salaries for the official and the deputies made it necessary and desirable to add the word "accepts" and the words "for his own use or the use of any other person" to prevent the official from requiring or making an agreement with his deputy to give up part of his salary for the use of the official or the use of any other person. He was thereby prohibited from increasing his own compensation or the compensation of another person.

The development of payment of officials in Arizona is similar to that of California. Prior to statehood, the fee system was in effect. For example, the clerks of the district courts in counties of the first class retained all of their fees up to $2,400 per annum. The clerk was also permitted to appoint a deputy, whose salary was payable out of the fees not to exceed $100. per month. The history being similar a fortiori the objectives were the same, and in construing the words of this statute they

should be given the construction which meets the objective of the legislation.

■ The question as to whether this statute is vague, indefinite, and uncertain hinges upon the interpretation of the words "for his own use or the use of any other person." The legislative history shows that it was the intent of both the California and the Arizona legislatures in adopting this legislation to prevent an official from reducing the salary of a deputy by accepting, retaining, or diverting a portion thereof for the official's own use, or for the use of another person. It should be emphasized that it was the intention of the legislature to prevent an official from increasing his own compensation, or that of another. By the use of the words "own use" the intent of the legislature is made plain that the objective was to prevent the official from putting more money in his own pocket for personal use or more money in the pocket of another person for personal use. Under this interpretation, there is no double meaning, and A.R.S., § 38–609, is definite and certain.

Defendant contends that the statute is unconstitutional because it "does not make it clear that a campaign contribution after disbursement falls within the prescribed [sic] conduct." In his discussion he contends that the same is vague, indefinite,

and uncertain in regard to contributions for political campaigns, because it places upon defendant the burden of determining whether "a particular campaign gift has been derived at any point from the fees and salary of an employee."

It is plain that the California legislature never intended that this act would prevent contributions from an employee for campaign or political purposes. In 1945 the legislature, under the chapter on political activities, enacted § 19730, which reads as follows:

"§ 19730. Soliciting or receiving assessment, subscription, contribution, or political service. A State officer or employee shall not, directly or indirectly, solicit or receive, or be in any manner concerned in soliciting or receiving, any assessment, subscription, contribution, or political service, whether voluntary or involuntary, for any political purpose whatever, from any one on the employment lists or holding any position under this part or board rule." [2]

Obviously, the California legislature did not consider its § 1195, supra, applicable to campaign contributions, since it felt compelled to enact the foregoing statute. California has held that it is the rule of statutory construction that the intention of the legislature controls, and that to find

2. Added by Stats.1945, ch. 123, § 1, p. 571. Based on: (a) Stats. 1937, ch. 753, § 197, p. 2109. (b) Stats.1913, ch. 590, § 19, p. 1046, as amended by Stats.1919, ch. 654, § 1, p. 1348.

such an intent a statute will be construed with reference to all the statutes which relate to the same subject matter, and all statutes in pari materia are construed together. People v. Hale, 156 Cal.App.2d 478, 319 P.2d 660; and County of Placer v. Aetna Casualty and Surety Co., 50 Cal.2d 182, 323 P.2d 753. This is also the rule in Arizona. Desert Waters, Inc. v. Superior Court, 91 Ariz. 163, 370 P.2d 652; and Peterson v. Flood, 84 Ariz. 256, 326 P.2d 845.

An examination of the cases in regard to campaign contributions shows that the indictments are under "corrupt practices" acts. Acts prohibiting campaign contributions have been held constitutional. United States of America v. Wurzbach, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508; In the Matter of Curtis, 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232; and Commonwealth v. McCarthy, 281 Mass. 253, 183 N.E. 495, 85 A.L.R. 1141. However, in such instances they are definite and certain in prohibiting campaign contributions.

■ We agree with defendant that an interpretation of the words "his own use" and the "use of any other person" to include contributions for campaign expenses or what he referred to in his brief as a "flower fund" would make the statute vague, indefinite and uncertain. Such an interpretation could include money collected and turned over to an officer for a donation to a church, or for any charitable purpose. In making a determination of the intent of the legislature, we have held that the words of a statute are to be given their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended; and in making such a determination, we should adopt the meaning that naturally attaches to the words used and which best harmonize with the context. State v. Curry, 97 Ariz. 191, 398 P.2d 899; Phoenix Title & Trust Co. v. Burns, 96 Ariz. 332, 395 P.2d 532; Moore v. Arthur Realty Corp., 95 Ariz. 70, 386 P.2d 795; State Board of Dispensing Opticians v. Schwab, 93 Ariz. 328, 380 P.2d 784.

■ Using the ordinary meaning of the words "own use" and the "use of any other person" and the meaning that appears from the context and the history of the law, we conclude that this statute was never intended to include campaign contributions, or contributions such as that for flowers and charitable purposes, or small gifts such as birthday or Christmas gifts—that the words "his own use" and "the use of any other person" are confined to personal use and personal benefit of the official or another person. The right to engage in political activities, or to make contributions to a campaign, is a privilege of citizenship which can only be denied by express language of a statute. Campaign contributions are recognized and

approved under Arizona election laws. Title 16, Chapter 4, A.R.S. We do not say that under any facts money raised for campaign purposes, flowers, or some other purpose might not be converted or diverted to the personal use of the official or another person rather than used for the purpose for which it was contributed. If such a diversion were used by the official to increase his compensation or the compensation of another person, then it would be a violation of the statute. This is a question which will have to be determined in the proceedings before the superior court. We hold that A.R.S. § 38–609 is not vague, indefinite, or uncertain, and therefore is constitutional.

The other question presented is whether the indictment is defective in that it fails to advise the defendant of the nature and the cause of the accusation against him. Defendant contends that the information cannot be supplied by a bill of particulars because the prosecutor, in supplying the particulars, would be guessing at what was in the grand jury's mind or describing the meaning of the charge by the grand jury. We do not agree with that interpretation of the statute. We have held, in many cases, that an indictment or information in the language of the statute is sufficient. State v. Burgess (1957) 82 Ariz. 200, 310 P.2d 822; State v. Gordon (1955) 79 Ariz. 184, 285 P.2d 758; State v. Poole (1942) 59 Ariz. 44, 122 P.2d 415;

and Adkins v. State (1934) 42 Ariz. 534, 28 P.2d 612. We therefore hold that all information can be supplied by a bill of particulars, and that the indictment is not fatally defective.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and UDALL and LOCKWOOD, JJ., concur.